February 9          22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

IN RE SEARCH WARRANTS

Case No. ___3:22mj143 SDV___

**Filed Under Seal**

February 9, 2022

**AFFIDAVIT IN SUPPORT
OF APPLICATIONS FOR SEARCH AND SEIZURE WARRANTS**

I, Michael Sorrentino, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms

and Explosives ("ATF"), being first duly sworn, herby depose and state as follows:

**INTRODUCTION**

1.      I submit this affidavit in support of search and seizure warrants in relation to violations of

Title 18 U.S.C. § 922(a)(1)(A) (dealing and manufacturing in firearms without a license), Title

18 U.S.C. § 922(o) (possession of a machinegun), and Title 26 U.S.C. § 5861(b) (possession of

an unregistered National Firearms Act firearm) (the "TARGET OFFENSES") for:

a.      ████████████████ CT; a single-family, two-story residence with a

combination of white siding and brick.  The front door to the residence is white.  To

the left of the front door is an attached garage with a white roll-up door.  The

residence is located at the end of a gravel/dirt driveway.  The location is clearly

marked with the number "██" affixed to the siding above the garage door as

described in Attachment A-1 (the "TARGET LOCATION").

b.      The person of ████████████ as described in Attachment A-2.

c.      The cellular telephone connected to the phone number ████████, as described

1

in Attachment A-3.

## AGENT BACKGROUND

2.        I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF").  As such, I am a law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered

by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516

of Title 18.  I have been employed by ATF as a Special Agent since July 2015.  Prior to the

ATF, I was employed by Fidelity Investments as both an Assistant Security Manager and a

Regional Background Investigator. I am a graduate of the Criminal Investigator Training

Program and the ATF Special Agent Basic Training program, both of which are conducted at

the Federal Law Enforcement Training Center in Glynn County, Georgia.  I hold a Bachelor of

Science Degree in Criminal Justice and a Minor in Psychology.

3.        I have received specialized training in firearms identification and the investigation of

firearms-related offenses.  I have participated in investigations involving the unlawful possession

of firearms by prohibited persons, including persons who are previously convicted felons; the

possession of firearms in furtherance of the distribution of narcotics; and the use of firearms in

the commission of violent acts.  I have participated in investigations involving individuals who

unlawfully possess firearms, of individuals illegally selling firearms, and of individuals

distributing illegal drugs.  As such, I have participated in the controlled purchases of illegal

narcotics and participated in controlled purchases of firearms utilizing confidential sources and

cooperating witnesses; participated in the execution of search and arrest warrants pertaining to

individuals involved in the illegal possession and distribution of firearms and narcotics;

conducted physical surveillance of individuals involved in illegal drug distribution; analyzed

records documenting the purchase and sale of firearms; provided Grand Jury testimony, and

spoke with informants and subjects, as well as law enforcement officers and agents, regarding

the manner in which individuals obtain, finance, store, transport, and distribute their illegal

firearms and drugs.  In addition, I have been involved in the investigation of street gangs,

including gangs with a national presence as well as locally based gangs.  I have received training,

either formal or on-the-job, in the provisions of the federal firearms and narcotics laws

administered under Titles 18, 21 and 26 of the United States Code.

4.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, law enforcement officers and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for the requested

warrant and does not set forth all my knowledge about this matter.

5.      I am currently assigned to ATF Boston Group III (Crime Gun Intelligence Center) and

have been conducting this investigation in conjunction with the ATF New Haven Field Office,

Connecticut State Police, and the Montville Police Department.  This investigation involves the

illegal manufacturing and dealing of firearms without a Federal Firearms License (FFL) and the

unlawful possession of unregistered NFA weapons by ███████████ at his residence

located at ███████████████ .

## DEFINITIONS

6.      Certain terms used in this affidavit have the following meanings:

a.  **Firearm** – The Gun Control Act of 1968 ("GCA"), as amended, defines a "firearm" as, among
    other things: "any weapon (including a starter gun) which will or is designed to or may readily
    be converted to expel a projectile by the action of an explosive… [and]…the frame or receiver
    of any such weapon[.]" *See* 18 U.S.C. § 921(a)(3)(A) and (B).

b.  **The National Firearms Act ("NFA")**, 26 USC § 5801, *et seq*., regulates a subset of the
    firearms covered by the Gun Control Act.

i.  The NFA applies only to certain firearms and weapons, including, but not limited to: machine guns, silencers, short-barreled rifles, short-barreled shotguns, and some other types of weapons, termed "destructive device" and "any other weapon," as defined in 26 USC § 5845. *See* 26 U.S.C. §5845. Based on my training and experience, I am aware that some firearms fall into the purview of the NFA only because they are shorter in length than other similar firearms of their type. This is because shorter firearms are more easily concealable on the person.

ii.  The NFA directs the ATF to maintain a registry, the National Firearms Registration and Transfer Record ("NFRTR"), of all NFA-regulated firearms and weapons in the United States that are not under the possession or control of the United States government. *See* 26 U.S.C. § 5841.

iii.  Manufacturers of NFA weapons must register these weapons upon manufacture. Furthermore, any transfer of an NFA weapon must be approved by ATF before it can be completed. Manufacturers and transferors also owe a tax on each respective transaction. The NFA provides that it is unlawful for any person (or entity) to receive or possess any NFA-regulated firearm or weapon that is not registered to him or her (or it). *See* 26 U.S.C. § 5861(d). Furthermore, before any NFA-regulated firearm or weapon is transferred from one person (or entity) to another, the transferor and transferee must complete an application form, the form must be approved by ATF, and the transferor must pay a transfer tax of $200. *See* 26 U.S.C. §§5811-5812. Any firearm or weapon in violation of the NFA is subject to seizure and forfeiture by the United States. *See* 26 U.S.C. § 5872.

## PROBABLE CAUSE

7.       In January 2021, a Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) Industry

Operations Investigator (IOI) received a phone call from a concerned citizen reporting that



may be manufacturing firearms through his business,

without a Federal Firearms License (FFL).  The concerned citizen stated that while seeking a

business to complete work on his/her personal firearm, he/she was referred by a friend to                    s

.  The concerned citizen subsequently located the Facebook account for

and observed a business card (see below), indicating that the business held an FFL,

which would allow for the desired work to be performed on his/her firearm.  As illustrated

below, the business card indicates that ███████ is an FFL and SOT.[1] Based on the business

card, the available services include firearm stippling, bluing, total builds, cerakote, and complete

restoration.



*Screenshot taken from publicly accessible "DeFelice Defense" Facebook page*
*(https://www.facebook.com/pages/category/Gun-Range/DeFelice-Defense-102493181302335/)*

8.      The concerned citizen ultimately contacted ███████ and spoke to him about

performing work on his/her firearm that would require an FFL.  As the conversation progressed,

the concerned citizen became suspicious when ███████ wouldn't provide his FFL number to

him/her when asked.  Instead, ███████ responded by saying (in reference to his/her firearm),

"don't worry about it.  We'll get it done and back to you no problem."

9.      After conducting additional publicly available research on ███████ and ███████

███████ the concerned citizen contacted ATF for guidance.

10.      Later that day, the same ATF IOI performed a query of ATF's Federal Licensing System

(FLS), which revealed negative results for ███████ and ███████ This query was

subsequently confirmed by an ATF Licensing Examiner.  Since that time, additional queries in

FLS for ███████ have also shown negative results. It should be noted that  I have has since

conducted business record queries for ███████ and ███████ (and

alternate variations of the name) in the Connecticut Secretary of State website

---

[1] "SOT" means a special occupational taxpayer, a person or entity qualified to import, manufacture, or deal in NFA firearms by having paid the special (occupational) tax to do so under the NFA.

(onlineBusinessSearch (ct.gov), with negative results.

11.     Based on the investigation thus far, my training and experience, and consulting with other law enforcement officers and agents, I believe that ████████ is holding himself out as a Federal Firearms Licensee, an SOT, and legitimate business owner as a way of attracting potential customers.  By doing so, ████████ is misleading customers into believing they are doing business with an individual and business that is both legally licensed to sell, repair, and perform specialized work on firearm(s) and legally licensed to possess and sell/transfer NFA weapons.

12.     In June 2021, an ATF IOI Specialist (IOI-S) received records from the Connecticut State Police Special Licensing & Firearms Unit (CTSP-SLFU) regarding ████████ reported firearm purchases and transfer/sale history.  According to those records, ████████ requested and received authorization from the CT State Police to transfer or sell at least 173 firearms from May 2013 – May 2021.[2] The records indicate that a large majority of the sale/transfers were to FFLs and the rest to private permit-holding citizens.  The records also showed that ████████ used his own Connecticut pistol permit number to complete the sale or transfers, which demonstrates that he is not doing so with a Federal Firearms License.

13.     On June 2, 2021, a New Haven Police Department Detective assigned as an ATF Task Force officer, (herein referred to as "UC1") contacted ████████ in an undercover capacity at phone number (██ ████████ (TARGET TELEPHONE), which is listed as the contact phone

---

[2] The process of selling or transferring a firearm in the state of CT is a self-reported system that is completed in part by contacting the CT State police, receiving an authorization number, completing, and submitting the CT DPS-3-C form titled, "Sale or Transfer of All Firearms."  This requirement is the responsibility of the seller/transferee (ie. an FFL for commercial sales and the transferee in the case of a private sale). When completing the form, the filer is required to designate, among other characteristics, whether the firearm is a handgun, long gun, "other", or unfinished frame/receiver. The form explains that an "other" refers to "frames, receivers, NFA weapons, etc.  See instructions for Question 18 on ATF form 4473."

number for ▮▮▮▮▮▮ on the aforementioned ▮▮▮▮▮▮ Facebook page, regarding the purchase of a firearm build. During the call, ▮▮▮▮▮ discussed aspects of his business and agreed to build and sell firearms to UC1.

14.     On November 18, 2021, UC1 contacted ▮▮▮▮▮ at the TARGET TELEPHONE number as a follow-up to their previous conversation.  Shortly after initiating the call, a male answered the phone and confirmed that it was ▮▮▮ UC1 explained to ▮▮▮▮ that they spoke on a prior occasion about ▮▮▮▮ building him an "other"[3] firearm. After refreshing ▮▮▮▮▮▮ memory on the details of the firearm they discussed, UC1 asked for ▮▮▮▮ suggestion on the firearm's length. ▮▮▮▮ replied, "I prefer short-barreled guns. Here is the beauty of the "other" world, it's like having an SBR (short-barreled rifle) without a tax stamp."[4]

15.     As the call progressed, ▮▮▮▮ and UC1 discussed specifics of the custom firearm such as color, caliber, and length.

16.     After discussing specifics of the firearm, ▮▮▮▮ provided the purchased price of $2,500.00, which he stated he required up front.  He stated that after receiving the money, he would order the parts and complete the firearm.

17.     When asked how the transfer of the firearm would be completed, ▮▮▮▮ stated, "So I do all transfers in house, so that's no big deal…when the time's appropriate, you just send me a picture of your pistol permit. I take care of all the transfers the day that it goes to you." When asked about payment for the build, ▮▮▮▮ stated he preferred Venmo or cash. ▮▮▮▮

---

[3] In this context, when UC1 referred to an "other" firearm, he was referring to a firearm that is classified neither as a rifle nor a pistol, based on certain characteristics, most importantly, the use of an "arm brace" in lieu of a stock.  When correctly configured, this firearm is legal according to both under federal law and Connecticut laws and regulation.

[4] Based on my training and experience and the context of the conversation, I believe ▮▮▮▮ was referring to an NFA tax stamp, which is a tax required to be paid to the ATF (along with an approved application) to legally possess an NFA weapon.

added, "…cash is the absolute best way, so I don't have to charge you sales tax." He added that,

"the nice thing about cash too is that nobody has to know what you're purchasing, it's none of

their goddam business, especially when we live in a world where the government wants to know

every dollar you spend." When questioned on the applicable FFL paperwork needed to transfer

the firearm, ▮▮▮▮▮▮ stated, "I make it even easier. So, I just do it on a DPS-3 (the form used

in Connecticut for the sale or transfer of all firearms) from me to you. Here is the reason why,

um a back door I suppose…When you buy a gun, right? You purchase it in a specific caliber and

a specific barrel length. Down the road if you're like, hey, I want to put a sixteen-inch upper on

my lower…So, what I do is I take it from my FFL and I put it in my personal name, I transfer it

to you as an unfinished receiver." He further explained that as a result, "you have no limitations

on what you can do to that gun."

18.     The call ended shortly thereafter after UC1 stated he would try to bring the money for the

firearm in the beginning in December.

19.     Based on my training and experience and speaking with other law enforcement officers

and agents, I believe ▮▮▮▮▮▮▮ knowingly attempted to mislead UC1 into believing he was a

legitimate FFL by stating, "I take it from my FFL and I put it in my personal name…," when

UC1 asked about the applicable FFL paperwork needed to transfer the firearm.  I also believe

that ▮▮▮▮▮▮▮ showed a willingness to falsify the CT transfer firearm transfer form (DPS-3-C)

by stating, …I transfer it to you as an unfinished receiver.").

20.     On a later date, UC1 contacted ▮▮▮▮▮▮▮ via text at the TARGET TELEPHONE

number regarding his Venmo account name and received the following: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21.     I obtained records from Venmo for the account associated with the account for

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After comparing the Venmo records, which indicate that the account was

opened in May 2021, and additional Transfer/Sale records received from the Connecticut State
Police, it appears that the following Venmo transactions were related to the sale of firearms:

- **May 27, 2021** – ██████ received $2,400 from "██████" with the following Venmo
  transaction note: "Socom build".  Per CTSP records, ██████ requested and received
  authorization from the CTSP to transfer or sell a handgun to ██████ approx. a
  week earlier May 20, 2021.

- **August 11, 2021** - ██████ received $2,375 from "██████" with the
  following Venmo transaction note: "build".  Per CTSP records, ██████ requested and
  received authorization from the CTSP to transfer or sell a firearm or an unfinished
  frame/receiver to ██████ on that same date of August 11, 2021.

- **August 17, 2021** - ██████ received $2,000 from "██████" with the following
  Venmo transaction note: "Foot Massage!!"  Per CTSP records, ██████ requested and
  received authorization from the CTSP to transfer or sell a firearm or an unfinished
  frame/receiver to ██████ on that same date of August 17, 2021.

22.    In the first two examples, the word "build" is in the description of the transactions and
the amount of money received by ██████ ($2,400 & $2,375) is consistent with the $2,500 he
charged UC1 for the previously discussed firearm build.  In the third example, the amount of
money received ($2,000) is consistent with what he later stated was the lowest amount he would
sell the same type of firearm sold to UC1 for (1,800.00).

23.    On December 15, 2021, UC1 met with ██████ at his residence located at the
TARGET LOCATION to provide the agreed-upon $2,500.00 and further discuss the
specifications of the firearm that ██████ was going to build.  The meeting was audio/video
recorded.

24.    On that date, at approximately 2:50 PM, UC1 arrived at the TARGET LOCATION and
was greeted by ██████ at the front door. After entering the residence, ██████ escorted
UC1 into the basement, which ██████ described as the "gun shop." Once in the basement,
██████ began discussing caliber options and pointed to other firearms located on a table as

references. Shortly thereafter, ███████ picked up a camouflage firearm that he described as his engineered gun and spoke about it to UC1. ███████ handled the firearm and allowed UC1 to do the same ███████ stated that the firearm was 14.5 (inches long), which he added would still, "sit inside the Connecticut legal limit."

25.     ███████ continued to show UC1 different firearms while highlighting their features. While doing so, ███████ picked up the camouflage firearm and stated that it's actually an "SBR" (short-barreled rifle) since it has a stock on it. He advised that, "when you transport it, put a brace on it. When you decide you want to go to the range, throw your stock onto it. They can't do anything about it. I register them as unfinished receivers.  That gives you more freedom…" When later asked for clarification on the difference between the two configurations, ███████ explained that when the firearm has the brace on it, it's an "other," when is has the stock, it's a short-barreled rifle. He further explained that if the firearm has "nothing," referring to neither a brace nor stock, it's still an "other." He went on to state in substance that since the firearm is registered as an unfinished receiver, he can assist in modifying the weapon with a different upper if desired.  He added that when you register the firearm as a "definite rifle, it's totally different."

26.     During their discussion, UC1 referenced the camouflage rifle and asked if it was technically an "SBR." ███████ responded that it was a registered "SBR" and the rest of the firearms were "others." A short time later, ███████ handed UC1 what he described as a 9mm AR (assault rifle).

27.     ███████ showed UC1 a firearm that he stated had a "cerakote" finish. Additional firearms were shown to UC1 to include a Norinco, model 97 in a rifle vise stand (which he explained was getting redone for competition), a completed Ruger 44 caliber carbine that he fixed for a customer (that he detailed had a receiver that was so "bad" that there was a lot of

grinding, cutting, and welding that had to be done), an SKS variant receiver with no stock, and a

personally-engineered 9mm upper half for an AR-15. ██████████ highlighted that he takes in a

lot of heirloom guns (for repair).

28.    Following their discussion, ██████████ added the firearm build information and UC1's

information (to include his pistol permit), into an application on his phone that he called his

"logbook." He advised that the firearm should be completed the following weekend and to plan

to shoot the weapon at his range down the road when he picks it up.

29.    Shortly thereafter, ██████████ brought UC1 upstairs to the kitchen and introduced him to

his wife, who he stated handled all the money.  Once in the kitchen, ██████████ wife placed a

laptop on the table and opened it. After ██████████ explained that he already uploaded the

information into the "air table," she closed the laptop and left the kitchen table with it.

██████████ proceeded to write a receipt for the order and provided it to UC1. At ██████████

direction, UC1 then provided the $2,500.00 to his wife.  After doing so, at approximately 3:27

PM, UC1 exited the residence.

30.    On January 11, 2022, at approximately 2:43 PM, UC1 and an ATF Special Agent

working in an undercover capacity (herein referred to as UC2) met with ██████████ the

TARGET LOCATION to receive the ordered firearm.  The meeting was audio/video recorded.

31.    ██████████ greeted the UCs at the door, and UC1 introduced UC2 to ██████████.

██████████ led the UCs to the dining room on the first floor of the residence.  The UCs observed

a black AR-15 type firearm (the purchased firearm) and a pistol on the dining room table.

32.    Once at the table, ██████████ picked up the purchased firearm, later identified as a Dark

Storm Industries, model DS-15, multi-caliber firearm bearing serial number EST4510, and began

explaining some of the features and upgrades to the item, indicating that he had provided UC1

with more upgrades than UC1 had paid for, specifically describing some of the parts, features and accessories on the firearm.  UC2 asked ▮▮▮▮▮▮ if he made the firearm, to which he replied, "from the ground up, yes." ▮▮▮▮▮▮ then stated that this type of firearm was about to be banned, and that now was the time to buy.  He further stated that, "a lot of guys have been coming and buying "others" from me…" He noted that the purchased firearm was worth $3,000.00 "today," and that it would be worth $6,000.00 in a month, and $12,000.00 in a year.

33.     UC1 asked ▮▮▮▮▮▮ if he could show the UCs some of the other firearms he had made. ▮▮▮▮▮▮ then went upstairs and entered a room with a door at the top of the stairs on the right.  He returned shortly, stating "my room's literally a gun store," with one tan camouflage firearm (which UC1 recalled as the SBR shown to him during their last meeting on December 15, 2021) and one black firearm, both AR-15 types. ▮▮▮▮▮▮ again indicated that he builds firearms from start to finish, to include painting them.

34.     ▮▮▮▮▮▮ led the UCs down to the basement of the residence which he referred to as the "gun shop."

35.     ▮▮▮▮▮▮ stated that "everything starts, it starts from nothing" and showed the UCs a workbench with some tools.  He then pulled an AR-15 type lower receiver from a sandblasting cabinet, stating "I just milled this one here."  He handed UC2 an aluminum receiver that appeared ready, or almost ready, to receive additional parts. ▮▮▮▮▮▮ indicated that it started as a block of aluminum and that he milled it into the part's current state.  He noted that it would get "stamped" as well.  He then led the UCs to a small room a few steps away that he referred to as his paint booth.

36.     Returning to the workbench area, ▮▮▮▮▮▮ eiterated that he (often using the plural pronoun "we") does everything from start to finish in building his firearms. ▮▮▮▮▮▮ then

12

talked about some of the other firearms he was in the process of restoring. There were a few long guns on either the shelf or the lower worktable that was adjacent to the workbench. He stated that building ARs was his "specialty" and stated in substance that other companies who make ARs were losing money because he's building them.

37.     UC2 asked UC1 how much UC1 had paid for the purchased firearm, to which UC1 responded "over 2," meaning more than $2,000.00. UC2 asked ████████ if he could make a similar firearm for closer to $1,500.00. He replied that $1,800.00 was his minimum for a basic firearm with no upgrades. UC2 asked ██████████ how many firearms he had made. He stated that he "checked his book yesterday," and that the purchased firearm was number 9,300, "in the last two years." UC2 asked ████████ he was "a one-man operation," however, he did not respond to this question. He then stated that he has been responsible for "developing at least 30 firearms." He then went into some detail about how and what he did. He noted that he has his own pistol coming to market soon.

38.     ████████ then told UC1 that he did not have any 10-round magazines, so he provided UC1 with a "30," which the UCs understood to be a 30-round capacity magazine, stating "which is highly [expletive] illegal," and "if anyone asks, you found it." ████████ then stated his belief that it was illegal to purchase 30-round magazines, but not to possess them.

39.     UC1 than asked ████████ about details of a Glock handgun that ████████ had on the workbench. He explained some of the modifications "we" made to the firearm. He then explained how he modifies firearms to make them better, and then called his wife from his cell phone and asked her to "bring down the ████████████

40.     UC2 questioned ████████ about how he obtains his customers. He stated that he sells firearms primary via word of mouth, and "when you start advertising, then like, ATF becomes a

pain in your ass."  He stated, "I don't want to be a gun store, I never wanted that."  He explained

that typical salespeople don't have any real experience or knowledge, and that they just want to

make money.

41.     At this point, ████████ wife brought a pistol to ████████ and went back upstairs.

████████ then explained the advantages of this pistol, which he claimed would be on the

market "here" soon.  Despite never mentioning any partners or specific others involved,

████████ used the pronoun "we" when describing what he (and possibly others) did to make

this firearm superior to a factory Glock offering.

42.     ████████ indicated that he teaches and attends a lot of tactical training.  Using his

cellular telephone, he pulled up and showed the UCs a number of shooting and/or training videos

from what appeared to be Instagram.  He continued to discuss some of the custom work he has

done to firearms, noting that some gun stores buy his products to sell in their stores.

43.     UC1 asked ████████ about Connecticut's laws regarding fully automatic firearms.

████████ stated that, in Connecticut, the firearm has to be only fully automatic, not select fire,

and that he has "eight or nine machine guns."  He noted that the possessor of a machine gun has

to get a "tax stamp" for it, which is $200.00.  ████████ then described his "barely legal gun,"

an AR-15 with a suppressor, 12.5" barrel, and a grenade launcher.  He noted that it is "100%

Connecticut legal."

44.     Referring to the purchased firearm and UC1, ████████ related that "in any other state,

his gun would be considered a short-barreled rifle and would have to have a tax stamp on it."  He

then explained that the firearms community in Connecticut found a way around this by creating

firearms that fit into the "other" category, being neither handguns nor rifles.  When asked,

████████ indicated that the purchased firearm could only be bought in Connecticut, but once

purchased, could be transported out of state.  He stated, "it's your loophole way of getting your

hands on that platform while everyone else is paying $5-6,000.00 and a $200.00 tax stamp."

45.      ████████ discussed the interstate purchasing of rifles, and the fact that AR-15 type

firearms are very valuable in Connecticut due to the ban.  ████████ stated that he had a "guy

come down" who bought ten rifles from him.

46.      He talked about buying a number of AR-15 type rifles as investments, confident that the

prices will rise due to the likely banning of all AR-15 firearms.  At one point, ████████

pointed to a safe in the basement and stated, "that safe over there is full of AR's just for sale…"

████████ further stated that, "one guy that deals with me, I'm not allowed to give you his

name.  So, I do what I do because it's extremely confidential and no one has to know what

you're doing.  He bought a lot, he spent a lot of money, but he has four kids."  He went on to

state that each of the unnamed customer's children have seven AR-15s in the customer's "home

collection."

47.      ████████ again talked about the pitfalls of purchasing cheaper firearms not made by

him.  He indicated that a portion of his business is fixing firearms sold at other stores.

48.      UC1 then took the aluminum receiver that ████████ had previously pulled from the

sandblasting cabinet and asked if it was an 80% receiver ████████ indicated that it was not,

and that it started out as a block of aluminum, as he had previously stated.  He indicated that

different manufactures will "stamp" it for him, noting that DSI (Dark Storm Industries) stamped

the purchased firearm.

49.      UC1 asked about ████████ milling out receivers.  He indicated that he used a machine

to do that work, and that the drill press in his basement was not used for that purpose.

████████ indicated that he was currently in possession of 438 guns, pointing out two gun safes

in the basement, stating both were full.  He reported that he has "more guns in his bedroom than

most gun stores have in inventory."  He also stated that he just "picked up a shockwave" which

he described as an "other," that's a 12-inch, short-barreled shotgun, which is "technically a

felony" that "they can sell because it's an "other."

50.     Near the end of the meeting in the basement, UC1 stated that he would likely come back

and order a second firearm.  ███████ advised that he would take a deposit from the UCs, and

that he had two lower receivers in inventory "ready to rock and roll."

51.     ███████ and the UCs then went back upstairs to the dining room to execute the

Connecticut DPS-3C form, which UC1 signed.  He then discussed the tan camouflage firearm

that was still on the table, and confirmed that it was an "SBR," indicating that if he put a brace

on it, it would be an "other."  He also stated that there was a device on the end of the barrel that

did the same thing as a suppressor, but without the need for a tax stamp.

52.     ███████ then provided UC1 with copies of the DPS-3C form, advising UC1 to keep

one copy and to drop one copy off at his local police department or state police. Shortly

thereafter, the UC's left the TARGET LOCATION in possession of the Dark Storm Industries,

model DS-15, multi-caliber firearm bearing serial number EST4510 (with magazine), two

Connecticut DPS-3C forms, and empty firearm flashlight and red dot site boxes.

53.     A query in ATF's National Firearm Registration and Transfer Record system revealed a

pending transfer of a silencer from a Connecticut FFL to ███████.  However, no other

records were found regarding registered (or pending) NFA items in ███████ name.  As

such, any NFA weapons in ███████ possession, would be a violation of federal law.

54.     Based on ███████ own statements concerning owning "8 or 9 machineguns," as

described in paragraph 43 above, and the aforementioned tan camouflage firearm being a

registered "SBR", I believe based on my training and experience that ████████ is in

possession of unregistered NFA weapons.

## BACKGROUND ON DEALING AND MANUFACTURING FIREARMS
## WITHOUT A LICENSE VIOLATIONS

55.     As set forth in my detail above, I have investigated and/or participated in operations

involving the criminal possession, procurement, construction, sale and distribution of firearms.  I

know, based upon my training and experience, that individuals involved in the illegal possession,

purchase or transfer of firearms routinely maintain in their residences evidence and currency

obtained from illegal sales, records indicating various illegal payments, profits and anticipated

profits.  Moreover, I know that individuals involved in the illegal possession of firearms not only

possess firearms and ammunition but also evidence relating to the acquisition of said items such

as shipment labels and purchase receipts.  I know that individuals engaged in the illicit

distribution of firearms may use electronic equipment to include cellular phones, computers,

computer modems and routers, and computer software to facilitate communication, orders and

processing, storage, transportation, payment and distribution of illegally transferred firearms.

Moreover, as outlined above, ████████ wife demonstrated intent to use a laptop computer to

process the order and sale of a firearm to UC1.  Additionally, I know that individuals that

manufacture firearms maintain tools, such as drills, specific bits and other machinery for the

construction and assembly of such items.

56.     Based upon my training, experience, and participation in this and other firearm

trafficking investigations, as well as information provided to me by other law enforcement

officers involved in the investigation of illegal firearms trafficking and/or manufacturing and

dealing firearms without a license, I know that:

       a.   Most people store their firearms in their homes;

17

b.  Firearms and related components are not readily disposed of by individuals.

c.  Persons who possess firearms usually possess other items related to firearms, such as: gun cases, ammunition, ammunition magazines, holsters, spare parts, cleaning equipment, photographs of firearms and receipts for the purchases of these items, containers/boxes that were purchased with the firearm;

d.  Persons who unlawfully engage in the business of selling firearms often maintain records that reflect their financial dealings;

e.  Persons who unlawfully engage in the business of manufacturing firearms maintain parts, tools and machinery used in the construction of said firearms;

f.  Persons who unlawfully engage in the manufacturing and sale of firearms maintain records related to the acquisition of related materials to include bills, shipping labels and shipping boxes;

g.  Persons possess in their residence over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as:

h.  Personal mail, check books, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, and telephone answering machine introductions.

## PROBABLE CAUSE TO BELIEVE THE TARGET TELEPHONE WILL CONTAIN EVIDENCE OF THE TARGET OFFENSES

57.     For the reasons above, there exists probable cause to believe that ███████ is actively manufacturing and dealing firearms without a federal firearms license, in violation of 18 U.S.C. 922(a)(1)(A). Moreover, there is probable cause to believe that he has and will continue to use the TARGET TELEPHONE to communicate with current and potential customers, whether they

18

be private citizens or FFLs.  In addition, there is probable cause to believe that ████████ will

have records in the TARGET TELEPHONE detailing specific information pertaining to the

firearms he has built, who they were built for, and their purchase prices.

58.    On February 4, 2022, I confirmed that the TARGET TELEPHONE number is still listed

on the ████████████ Facebook page. Accordingly, based on the communications had

between UC1 and ████████ over the TARGET TRELEPHONE, the responsiveness to text

messages and phone calls, and that ████████ (who is believed to be operating the ████████

████████ Facebook account) is listing the number on the Facebook page of ████████████

there is probable cause to believe that the TARGET TELEPHONE is in ████████ possession

and that he routinely carries that device with him during waking hours. For that reason, and

because of the technical information below, there is probable cause to believe that data stored

within the TARGET TELEPHONE to include call logs, messages, search histories, internet

browser histories, emails, navigation logs, and other stored geolocation, will provide evidence of

████████████ role in committing firearms offenses, including and may also assist law

enforcement to identify coconspirators, customers, and alternate locations he may use to

facilitate in manufacturing firearms.   As more fully described below, I also know that persons

engaged in unlawful firearms manufacturing and dealing without a license often rely heavily on

their cellular device, as it can, and is, relied on for this offense.  This can include calling firearms

dealers and parts suppliers, navigating to various locations related to purchasing parts and/or

selling completed firearms, contacting purchasers (via phone call or messaging), and conducting

other internet research on firearms and firearms parts dealers.  I know that even in the event

some or all of this data has been deleted by the user, significant portions of the data can be

retrieved by the forensic techniques employed by ATF.  I also know that some of this data is

inaccessible to the user of the device, and therefore cannot be deleted absent a full wipe of the device.  This data can be accessed by the forensic tools used by ATF, and in my experience, users rarely retain their device and fully wipe it.  This is for two main reasons.  First, most users are reluctant to wipe their devices, as it would be akin to starting from scratch.  All data – across the entire device, would be lost, a step most users will not take due to the important non-criminal data contained within, making it probable that evidence of ██████ firearms manufacturing and dealing remains on the TARGET TELEPHONE.

## ELECTRONIC DEVICE SEARCHES

60.    Based on my training and experience, and consultation with, and information from other law enforcement sources, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in illegal firearm  activities:

A.    the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

B.    call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

C.    descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

D.    records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books,

address books, date books, calendars, personal files, and photographs of persons

contained in the phone;

E.      information showing or tending to show the identity of the maker or user of the

data and information contained in the phone, such as passwords, sign-on codes,

and program design;

F.      GPS coordinates, waypoints, destinations, addresses, and location search

parameters associated with GPS navigation software;

G.      saved searches, locations, and route history in the memory of said device/s; and,

H.      internet browsing history, to include, internet searches in the memory of said

devices.

## TECHNICAL TERMS

61.     Based on my training and experience, and consultation with, and information from, other

law enforcement sources, I use the following technical terms to convey the following meanings:

Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a

handheld wireless device used for voice and data communication through radio signals.  These

telephones send signals through networks of transmitter/receivers, enabling communication with

other wireless telephones or traditional "land line" telephones.  A wireless telephone usually

contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless telephones offer a broad

range of capabilities.  These capabilities include: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and e-mail; taking, sending,

receiving, and storing still photographs and moving video; storing and playing back audio files;

storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

62.     Based on my training and experience, and consultation with, and information from, other law enforcement sources, I know that the TARGET TELEPHONE possesses some of the capabilities associated with wireless telephone, as listed above.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

63.     Based on my knowledge, training, and experience, and consultation with, and information from, other law enforcement sources, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

64.     *Forensic evidence.*  As further described in Attachment B-3, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET TELEPHONE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET TELEPHONE because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

- Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

- Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

65. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET TELEPHONE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.  Based on the above stated factual details of the investigation, there is probable cause to believe, and I do believe, that the TARGET TELEPHONE contains stored electronic information, including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers, and other electronic information as outlined in Attachment B-3, that will assist law enforcement in this investigation and which is evidence of the violations of the above.

I further request that the Court authorize execution of the warrant at any time of day or night because the TARGET TELEPHONE will be in the possession of the ATF.

## BIOMETRIC ACCESS TO THE TARGET TELEPHONE

66.    This warrant permits law enforcement to compel ██████ to unlock the TARGET TELEPHONE requiring biometric access subject to seizure pursuant to this warrant.  The grounds for this request are as follows:

(a)    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

(b)    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

(c)    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on

certain Android devices and is called "Trusted Face."   During the Trusted Face registration

process, the user holds the device in front of his or her face.   The device's front-facing camera then

analyzes and records data based on the user's facial characteristics.   The device can then be

unlocked if the front-facing camera detects a face with characteristics that match those of the

registered face.   Facial recognition features found on devices produced by other manufacturers

have different names but operate similarly to Trusted Face.

(d)      If a device is equipped with an iris-recognition feature, a user may enable

the ability to unlock the device with his or her irises.   For example, on certain Microsoft devices,

this feature is called "Windows Hello."   During the Windows Hello registration, a user registers

his or her irises by holding the device in front of his or her face.   The device then directs an infrared

light toward the user's face and activates an infrared-sensitive camera to record data based on

patterns within the user's irises.   The device can then be unlocked if the infrared-sensitive camera

detects the registered irises.   Iris-recognition features found on devices produced by other

manufacturers have different names but operate similarly to Windows Hello.

(e)      In my training and experience, users of electronic devices often enable the

biometric features because they are a more convenient way to unlock a device than by entering a

numeric or alphanumeric passcode or password.   Moreover, in some instances, biometric features

are a more secure way to protect a device's contents.   This is particularly true when the users of a

device are engaged in criminal activities and thus have a heightened concern about securing the

contents of a device.

67.      The passcode or password that would unlock the TARGET TELEPHONE subject to search

under this warrant currently is not known to law enforcement.   Thus, law enforcement personnel

may not otherwise be able to access the data contained within the TARGET TELEPHONE, making

the use of biometric features necessary to the execution of the search authorized by this warrant. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

68.     Due to the foregoing, if law enforcement personnel the TARGET TELEPHONE which is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of ███████ to the fingerprint scanner the TARGET TELEPHONE; (2) hold the TARGET TELEPHONE in front of the face of ███████ and activate the facial recognition feature; and/or (3) hold the TARGET TELEPHONE in front of the face of ███████ and activate the iris recognition feature, for the purpose of attempting to unlock the TARGET TELEPHONE in order to search the contents as authorized by this warrant.  The proposed warrant does not authorize law enforcement to compel ███████ to state or otherwise provide the password or any other means that may be used to unlock or access the TARGET TELEPHONE.

Moreover, the proposed warrant does not authorize law enforcement to compel ▓▓▓▓▓▓▓ to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the TARGET TELEPHONE.

69.    Based upon the foregoing, there is probable cause to believe, and I do believe, that a search of the TARGET TELEPHONE will provide evidence of a violations of the TARGET OFFENSES, among others, specifically as it relates to ▓▓▓▓▓▓▓ others known and unknown that may have conspired to manufacture and deal firearms without a license and possess unregistered NFA weapons.  I believe the evidence contained in the TARGET TELEPHONE will include photos of firearms in various stages of completion, firearms, firearm accessories, as well as communications involving these items and activities, locations at which these activities have taken place and/or where the items are being stored, to include ▓▓▓▓▓▓▓ travel history, and the websites and business contacts utilized to acquire parts, firearms or firearms accessories.  I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the TARGET TELEPHONE.

## CONCLUSION

70.    It is this affiant's belief that, based on Connecticut State Police firearm transfer/sale records, ▓▓▓▓▓▓▓ statements, the publicly accessible ▓▓▓▓▓▓▓ Facebook page, the firearm sold to ATF Undercover Agents/Officers, and other aforementioned information, there is probable cause to believe that, evidence, fruits and instrumentalities pertaining to violations of the TARGET OFFENSES as set forth in greater detail in Attachment B, are now located within the above-described subject premises, described more specifically in Attachment A, both of which are appended to the applications for search and seizure warrants for the subject

premises and incorporated herein by reference.

71.     I also have probable cause to believe and I do believe that based on communications had between UC1 and ████████ on the TARGET TELEPHONE, observations made by the UCs during the aforementioned meetings with ██████, the number listed on the publicly accessible ████████ Facebook page, and other aforementioned information, that evidence, fruits and instrumentalities pertaining to the TARGET OFFENSES as set forth in greater detail in Attachment B, are now located within the TARGET TELEPHONE, described more specifically in Attachment A, both of which are appended to the applications for search and seizure warrants for the TARGET TELEPHONE and incorporated herein by reference.

72.     I believe that public disclosure of this Affidavit, the requested search warrant, and seizure warrant may: compromise the ongoing investigation; cause potential witnesses to flee or not come forward in fear of prosecution; cause individuals to destroy physical evidence or conceal proceeds of criminal activity; and jeopardize the safety of law enforcement officers.  I therefore respectfully request that the Court order that this Affidavit, the requested arrest warrant, search warrant, and seizure warrant be sealed under further order of the Court.

        The truth of the foregoing affidavit, which was transmitted to me by reliable electronic means, has been attested to me by Special Agent Michael Sorrentino over the telephone on this
<u>9th</u> day of February 2022 at Bridgeport, Connecticut.

Digitally signed by MICHAEL
SORRENTINO
Date: 2022.02.09 08:31:42 -05'00'

Michael Sorrentino
Special Agent, ATF

S. Dave Vatti
Digitally signed by S. Dave Vatti
Date: 2022.02.09 09:36:51
-05'00'

HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

## PLACE TO BE SEARCHED

CT

The TARGET LOCATION is a single-family, two-story residence with a combination of white siding and brick.  The front door to the residence is white.  To the left of the front door is an attached garage with a white roll-up door.  The residence is located at the end of a gravel/dirt driveway.  The location is clearly marked with the number "███" affixed to the siding above the garage door. This authorization includes the above-described location, all rooms and other parts therein, together with the surrounding grounds, all safes, lock boxes, safety deposit boxes, or locked containers found therein, and any garages, storage rooms, and trash containers.



**ATTACHMENT B-1**

**DESCRIPTION OF ITEMS TO BE SEIZED**

, CT

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use of which is or has been used as the means of committing a criminal offense, namely, violations of 18 U.S.C. § 922(a)(1)(A) (dealing and manufacturing in firearms without a license), Title 18 U.S.C. § 922(o) (possession of a machinegun), and Title 26 U.S.C. § 5861(b) (possession of an unregistered National Firearms Act firearm) (the "TARGET OFFENSES"):

a.   Records of firearms transactions and customer/seller information to include but not limited to books, records, payment/sale receipts, notes, ledgers, CT DPS-3C Firearm Transfer or Sale forms, ATF Form 4473's, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution/transfer/manufacture of firearms, firearms parts, and/or tools and equipment used in the manufacture of firearms;

b.   Evidence concerning the financial operations of ▇▇▇▇▇▇▇ including, but not limited to, bank or other financial account opening documents, bank and credit card records, payroll records, ledgers, financial reports, and payment records;

c.   Evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in dealing and manufacturing firearms without an FFL;

d.   Cellular phone with phone number (▇▇▇ ▇▇▇▇▇ (TARGET TELEPHONE);

e.   U.S. Currency, checks, money orders related to the sale and proceeds of dealing and manufacturing firearms without a license;

f.   Firearms, NFA weapons, firearms parts, accessories, ammunition magazines, and firearm components;

g.   Tools, drill bits, machining items and other evidence that supports the manufacturing of firearms;

h.   Photographs of people, assets, or objects that may be related to the manufacture or sale of firearms, firearm parts, or the possession of machine guns or unregistered NFA firearms;

i.   Addresses or telephone numbers in books, papers, cellular telephones, tablets or computers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and communications to or from their associates

and/or clients regarding manufacturing and dealing in firearms without a license, firearms parts and/or tools and equipment used in the manufacture of firearms; photographs and videotapes of participants and associates dealing and manufacturing firearms without a license activity and property acquired as a consequence of dealing and manufacturing firearms without a license

j.     safes and other secure storage containers and their contents. This warrant specifically authorizes law enforcement to open and search all safes, safety deposit boxes, or locked containers found in the TARGET LOCATION and to seize any items detailed in this Attachment found therein;

k.     identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

l.     Electronic devices used to facilitate, document, or in the commission of the TARGET OFFENSES, including cellphones and laptop computers

## ATTACHMENT A-2

## PERSON TO BE SEARCHED

The Subject Person to be searched is ███████████████ who was born on ████████, and is depicted in the following photograph:



The search of ███████████ shall include any and all clothing and personal belongings, backpacks, briefcases, purses, and bags that are within ███████████ immediate vicinity and control at the location where the search warrant is executed.

**ATTACHMENT B-2**

**DESCRIPTION OF ITEM TO BE SEIZED**

The cellular telephone connected to the phone number ███ ██████ (the "TARGET TELEPHONE").

## **ATTACHMENT A-3**

## **ITEM TO BE SEARCHED**

The cellular telephone connected to the phone ██████ ██ ██████ (the "TARGET TELEPHONE").

# ATTACHMENT B-3

The items to be seized include:

All stored electronic information including records, telephone numbers, digits, names, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that relate to violations of 18 U.S.C. § 922(a)(1)(A) (dealing and manufacturing in firearms without a license), Title 18 U.S.C. § 922(o) (possession of a machinegun), and Title 26 U.S.C. § 5861(b) (possession of an unregistered National Firearms Act firearm (the "TARGET OFFENSES"), including:

1. any and all records, including any photographs and/or videos, concerning the purchase, sale, use, manufacture, or transfer of any firearms and/or firearm parts;
2. Evidence concerning the ownership of █████████████
3. the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET TELEPHONE;
4. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET TELEPHONE;
5. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;
6. any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET TELEPHONE, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET TELEPHONE;
7. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET TELEPHONE, such as passwords, sign-on codes, and program design;
8. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
9. saved searches, locations, and route history in the memory of the TARGET TELEPHONE;
10. internet browsing history, to include, internet searches in the memory of the TARGET TELEPHONE; and

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the TARGET TELEPHONE may be reproduced by printing said stored electronic

information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

<u>Unlocking the TARGET TELEPHONE with Biometric Features</u>

      During the execution of the warrant, law enforcement personnel are authorized to obtain from ███████████ the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the TARGET TELEPHONE, including to (1) press or swipe the fingers (including thumbs) of ███████████ to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of ████████ o activate the facial recognition feature; and/or (3) hold the TARGET TELEPHONE in front of the face of ███████████ to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.